Helen N. Dow, Personally and as Administratrix of the Estate of George W. Dow, Deceased, Claimant, *v.* State of New York, Defendant. (Claim No. 27560.)

Court of Claims, September 16, 1944.

*Charles Glatzer* and *William L. Standard* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Mortimer L. Michaels* of counsel), for defendant.

Ryan, J. Claimant's son, aged twenty-eight years, was a merchant seaman. In 1942 he became depressed over ship sinkings and the loss of his comrades. He grew worse and one night slashed his wrists in a suicide attempt. At Bellevue he was examined and committed to Pilgrim State Hospital being received there on July 22, 1942. On September 7, 1942, at 8:30 p.m. he was found by an attendant hanging from a ventilator handle in the water section of his ward. He had suspended himself by the strap from the restraining sheet in which he had been placed sometime before 5:00 p.m. and from which he

had freed himself. The man was not dead when discovered and prompt medical attention was given but it was unavailing. The claimant, as administratrix, sues to recover damages. She is clearly entitled to an award because upon the record before us no finding can be made other than to charge the State with negligence.

The hospital authorities had ample warnings of the patient's suicidal tendencies and were keeping him in restraint. But they violated their own rules which provide that no patient shall be kept in restraint continuously longer than two hours and that a patient in restraint shall be visited at least every hour. This man was put in restraint earlier than 5:00 P.M. and was not seen again by any attendant or employee until 8:30 P.M. Moreover, there was only one attendant for thirty-one patients in the ward which was one for disturbed patients. Two patients, of whom Dow was one, were in private rooms. At the time that Dow hanged himself the one attendant was with twenty-nine patients who were awake and in the day room. This was insufficient care in any aspect of the case.

During fifteen years we have consistently held the State to accountability in situations like this one. Consistently the higher courts have sustained our findings. Citations are unnecessary. The waiver of immunity from liability granted by an enlightened Legislature in 1929 has received favorable interpretation and judicial sanction. Progressive government accepts the responsibilities that the modern democratic State owes to the individuals in its society. It is now well established that the wards of the Empire State must have adequate care and supervision. In this instance the State of New York must respond in damages to the decedent's legal representatives.

To determine the amount of such damages we must now give consideration to two elements: (1) what were the probabilities that claimant's son would be restored to health and to usefulness in society, and (2) granting his recovery, what pecuniary loss did claimant sustain?

On the first point let it be said that the State's medical officers diagnosed Dow's illness as dementia praecox, catatonic type, with a poor prognosis due to family background. Dow's father had been several times committed to State hospitals and his sister was, at the time of trial, a patient in one. On the other hand there is psychiatric opinion before us, based upon the record of the case, that Dow's history was lacking in the characteristic traits of dementia praecox, catatonic type, and that he suffered rather from a depressive form of illness

or from a manic depressive psychosis. Should we accept the less favorable diagnosis, that of dementia praecox, we are reminded that the superintendent of the hospital, through one of his delegated assistants, wrote to Dow's mother, under date of August 27th, as follows: " After examination, it has been decided that a course of shock therapy is indicated in his case and should have a beneficial effect on his mental condition." Although the assistant who dispatched the letter referred to it as " a form letter which is carefully worded not to mislead relatives, not to make them over optimistic, and give them an idea exactly what the facts are ", we regard it as having an important bearing on the question under consideration.

According to their recent report to the Governor by the Temporary Commission on State Hospital Problems dementia praecox is a present day challenging psychiatric problem. It is recorded that one out of every four newly admitted patients to the New York State hospitals suffers from it and that such patients constitute between 50% and 60% of all patients in the State hospitals.* Shock therapy is a modern treatment and is given in various forms, among them insulin and electric shock. The Superintendent of Pilgrim State Hospital contributed an article to the Psychiatric Quarterly of January, 1943, to which was appended a table of results in two hundred cases of dementia praecox given shock therapy. In forty-six of these cases where the illness was of less than six months' duration there were 67.4% remissions which included recovered and much improved and in addition to that 21.7% improved. The contributor defined " remission " as " Therefore, the common term remission has been used here for those patients who no longer show any active psychotic symptoms and are able to take up their former professional and personal lives in the community. All patients classified under the heading ' remission ' were able to leave the hospital." (Psychiatric Quarterly, Jan. 1943, p. 144.)

Again referring to the report to the Governor, it is therein disclosed that 79.5% of 1128 dementia praecox patients treated with insulin shock therapy at Brooklyn State Hospital between January 1, 1937, and June 30, 1942, were able to leave the hospital, 71.1% returned to gainful employment and 55%

---

* Insulin Shock Therapy. Study by the Temporary Commission on State Hospital Problems, 105 E. 22nd St., New York, N. Y., June 30, 1944. (Not included in Legislative Documents for 1944 but deposited in Legislative Reference Library, Education Building, Albany, N. Y.)

became again members of society in the higher levels of usefulness. Herein is encouragement.

However, confining ourselves strictly to the record in this case, we find therein sufficient evidence to determine that with reasonable certainty claimant's intestate would have responded to shock therapy and with proper care and treatment, would have been restored to usefulness in society, and we so find.

What was claimant's pecuniary loss? She is the mother of the decedent. However, the usual intimate companionship of mother and son had not been maintained throughout his youthful years. Family life had been interrupted. From the time he was seven years of age until he was fifteen he had lived with his father, apart from the claimant. Between the age of fifteen and eighteen she saw him for a period of not more than one year. During that time the boy lived away from home and in another community, he attended a school, for which the tuition was paid by a friend, and in part earned his own livelihood. At eighteen he enlisted in the Merchant Marine and continued in that service to the time of his commitment to the State hospital. He was then twenty-eight years of age. He had attained the rating of Chief Electrician and for the year preceding his death earned approximately $3,000. During the latter years of his life, claimant saw more of her son. She was not in good health, had part-time employment in a department store and lived at a rooming house. After each voyage her son visited her, took her out to dinner and to the theatre and gave her sums of money from $50 to $100 at a time. His maximum contribution to his mother in any one year was $500. The evening before the day he was taken to Bellevue claimant and her son met at her mother's home. On that evening he talked of making an allotment of his pay to claimant.

Under all the circumstances it seems to us that the sum of $10,000 will meet the requirements of section 132 of the Decedent Estate Law for fair and just compensation to the person for whose benefit this action is brought. To this sum the Clerk will add interest as required by statute. There is no proof of expenses for medical aid or nursing or for the funeral.

Decision accordingly.